*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBIN LYNN ROOT,

        Defendant-Appellant.

UNPUBLISHED
April 9, 2020

No. 346164
Kent Circuit Court
LC No. 15-004835-FC

Before: O'BRIEN, P.J., and RONAYNE KRAUSE and GADOLA, JJ.

PER CURIAM.

Defendant, Robin Lynn Root, was convicted after a jury trial of second-degree murder, MCL 750.317, and sentenced to 25 to 50 years' imprisonment. Defendant appeals as of right, challenging both her conviction and sentence. We affirm.

## I. FACTS

This case arises from the murder of Janna Kelly on December 4, 2007. Defendant does not dispute that on that day she had an altercation with Kelly and killed her. Defendant was convicted after a jury trial of first-degree murder for Kelly's death. She thereafter appealed to this Court, which issued an opinion summarizing the underlying facts as follows:

> On the evening of December 4, 2007, Janna Kelly went missing from her Grand Rapids, Michigan, home. Her daughter and boss became concerned, and a police investigation ensued after Kelly's purse, wallet, and a fleece jacket were discovered abandoned at a local car wash the next day. Police also discovered Kelly's car parked in a neighborhood within walking distance of Kelly's home. Officers found blood on the car and on the jacket; test results showed that it belonged to an unidentified female donor. Officers also obtained Kelly's phone records and found that her phone had traveled from Grand Rapids to a location in Ottawa County on December 5, 2007.
>
> In the course of looking for her mother, Kelly's daughter searched her mother's house and discovered that Root had called Kelly's home phone on the night of her

-1-

disappearance. The daughter also discovered a note Kelly had written indicating that she was arranging to have Root pay a judgment that Kelly obtained against Root after she evicted Root from the duplex that she owned. The duplex was located behind Kelly's home.

Detective Tim DeVries with the Grand Rapids Police Department interviewed Root on Thursday, December 6, 2007. At the request of police, Root and her live-in male companion drove to the police station to be interviewed. Root's interview was recorded. At the time of the interview, Root was living in a different rental home located behind Kelly's house. Root acknowledged that when the police first approached her house that day, she told them they were probably there to talk with her about her ex-landlord. She explained that she saw the news story on television that evening and recognized Kelly immediately. Root stated that she had last seen Kelly the Saturday before and acknowledged that it was in regard to money she owed Kelly for unpaid rent, for which Kelly had obtained a judgment. Root described her personal encounters with Kelly on Wednesday, November 28 and Saturday, December 1, 2007, both occurring at Kelly's house. She was very detailed in answering questions concerning her whereabouts in the days leading up to Kelly's disappearance, including where she was when making two telephone calls to Kelly—at 5:02 p.m. and at 6:15 p.m.—on Tuesday, December 4, 2007, the evening Kelly disappeared. However, when asked about her activities on Wednesday, December 5, 2007, which was the day after Kelly's disappearance and only one day prior to the police interview, she took a long time to answer and became extremely vague. She stated that she was home for the most part, but that she was also over at her daughter's house and ran some errands. When asked about what errands she ran, she stated that one of them included getting gas. When asked what gas station she went to, Root said she could not recall, but that it was probably one of two that she typically uses. She stated that the farthest she drove that day was to pick up her son at his school, Forest Hills Central, which is located in Cascade, Michigan. When asked if she ever gets up to Grand Haven, Hudsonville, Jenison, or Zeeland, she said no, "I don't try and go that far" and that there was no reason for either her or her male companion to be out that way. Root voluntarily provided a DNA sample; it was not immediately sent to the lab for testing.

In March 2008, a surveyor discovered Kelly's remains while surveying a property in Grand Haven Township. Testimony and evidence established that someone had stripped Kelly of her clothing, dumped her in a secluded area, and set her on fire using gasoline, with charring most prominent around her face and upper body. There was also evidence that her mouth and limbs had been duct taped. Due to the partial burning, exposure to the environment, and animal activity, the medical examiner could not determine whether the perpetrator had asphyxiated Kelly. The medical examiner determined that Kelly died from homicide by unspecified means.

More than six years passed without discovering who killed Kelly. In 2014, cold case detectives Venus Repper and Kreg Brace with the Ottawa County Sheriff's Office reviewed Kelly's case. Repper noticed that some DNA profiles had not been sent to the laboratory that tested the blood from Kelly's car and the jacket found at

the carwash. She contacted DeVries about her discovery and the additional samples were sent to the lab. The results of the testing showed that the blood matched Root's DNA profile. DeVries also analyzed cell phone data and learned that Root's cell phone had moved along the same path at the same time that Kelly's cell phone had traveled west from Grand Rapids to Grand Haven on Wednesday, December 5, 2007. Root's cell phone stopped for a period of time in the same area where Kelly's remains were later found.

Repper and Brace contacted Root and visited her home on April 21, 2015, conducting a short, audiotaped interview, and arranging for her to visit the Ottawa County Sheriff's Office in West Olive the next day for a formal interview. The detectives did not inform Root about the DNA and cell phone evidence they had obtained. The following day, Root drove herself to the Sheriff's Office, where, in another audiotaped interview, she answered casual questions for 90 minutes before cutting the interview short in order to pick up her granddaughters from school. The interview ended before any detailed discussion of Root's whereabouts and activities at the time of Kelly's disappearance. Root arranged with detectives to complete the interview on another day. On April 27, 2015, Root again drove herself to the Sherriff's Office, where her interview with detectives began at 11:44 a.m. and lasted for approximately six hours. The interview was videotaped. After several hours of questioning, the detectives extracted from Root a confession. Root unsuccessfully sought to suppress the confession from being admitted as evidence at trial.

At her trial, Root conceded that she killed Kelly and dumped her remains in Ottawa County, but she argued that Kelly's death was an accident and that she covered up the crime out of panic. As already noted, the jury rejected Root's defense and found her guilty. [*People v Root*, unpublished per curiam opinion of the Court of Appeals, issued August 31, 2017 (Docket No. 331123), p 1-2.]

This Court vacated defendant's first-degree murder conviction finding that portions of her statement to police were inadmissible because they were obtained in violation of her Miranda[1] rights. *Root*, unpub op at 3-15. On remand to the trial court, defendant was again tried before a jury, and the portions of her statement to police that this Court had determined were inadmissible were not submitted to the jury. She was convicted of second-degree murder and thereafter sentenced to 25 to 50 years in prison. Defendant again appeals to this Court.

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

## II. DISCUSSION

## A. MOTION TO SUPPRESS

Defendant contends that the trial court erred when it denied her motion to suppress inculpatory statements she made to police after they confronted her with her cell phone location information that was obtained without a warrant. We disagree.

Shortly after Kelly disappeared in December 2007, the police, in an effort to locate Kelly, obtained the cell-site location information (CSLI)[2] related to her cell phone. From this information, the police were able to determine that on the morning after her disappearance, Kelly's cell phone was located near her home because the phone connected with a tower near her home. However, at 11:22 a.m. that day, Kelly's cell phone connected with a cell site in Hudsonville, and at 12:03 p.m., her cell phone connected with a cell site in West Olive, near where her body was later discovered in March 2008.

On September 23, 2009, the police obtained information from certain phone companies from what is known as a "tower dump." Although the officers obtained a court order to collect the information, they did not obtain a warrant. Unlike CSLI related to a specific cell phone, a tower dump is a download of information of all the devices that connected to a particular cell site during a particular time period. In this case, police obtained a tower dump for every phone number that connected to the cell phone tower near the victim's home and a tower dump for every phone number that connected to the cell tower near the location where her body was discovered during the relevant times. However, at that time the police did not decipher the information from the tower dump; the lead detective investigating the murder testified that at that time the police department had neither the software nor the expertise to do so.

Six years later, after detectives reviewing the police investigation as a cold case discovered that defendant's DNA matched the DNA found on the victim's car and jacket, police deciphered the CSLI obtained from the 2009 tower dump and found that defendant's cell phone had been in the area of the victim's cell phone at the time of her murder and the next day traveled at the same time as the victim's phone to the area where the victim's body was later discovered. In January 2015, police obtained the billing records for defendant's cell phone for dates that included December 5, 2007, again with a court order but without obtaining a warrant.

---

[2] Cell phones perform their functions by continuously connecting to a set of radio antennas called "cell sites." A modern device, such as a smartphone, connects with the wireless network several times a minute, if its signal is on, even if the device is not being used. These devices continuously scan the area and connect with the best signal, usually coming from the closest cell site. Each time a cell phone connects to a cell site, it generates a time-stamped record referred to as cell-site location information (CSLI). Wireless carriers collect and store this information for their own business purposes. As the number of cell sites has increased, it has become increasingly possible to precisely map the location of a person in possession of a cell phone and to map the person's movements over a period of time. See *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206, 2211-2212; 201 L Ed 2d 507 (2018).

In April 2015, the police again interviewed defendant; during the interview, the detectives confronted defendant with the information that they had gathered from the tower dump that her cell phone had been in the location of the victim's cell phone at the time she was murdered, and the next day defendant's cell phone moved at the same time as the victim's cell phone to the location where the victim's body was later discovered. Police also told defendant that her cell phone billing records indicated that she had called Billy Graham's hotline on December 7, 2007, and that they believed she made this call because she felt guilty for killing Kelly. Defendant eventually confessed to killing the victim and moving her body to the West Olive location.

At trial, defendant moved to suppress the statements that she made to police after the detectives confronted her with information they had gleaned from the tower dump. Defendant argued that she made the statements after police confronted her with evidence police obtained without a search warrant, and therefore her statements[3] were the product of a warrantless search and subject to suppression. Relying on a then newly-released Supreme Court decision in *Carpenter v United States*, ___ US __, __; 138 S Ct 2206, 2221; 201 L Ed 2d 507 (2018), defendant argued that the officers were required to obtain a search warrant before obtaining her CSLI. Defendant did not contend, however, that the statements were subject to suppression because information was gathered from her billing records about the call to the Billy Graham hotline.

The trial court denied the motion to suppress. The trial court observed that *Carpenter* involved CSLI obtained regarding a particular phone number and did not involve locational information ascertained through a tower dump of all numbers connecting with a cell tower at a particular time. The trial court also noted that there was no indication that the newly-announced warrant requirement of *Carpenter* was to be applied retroactively to invalidate earlier searches. The trial court therefore permitted the introduction of defendant's statements to police made after she learned that they had obtained the locational information.

On appeal, defendant contends that the police obtained the CSLI regarding her cell phone without a warrant in violation of the Fourth Amendment. She argues that the trial court therefore erred in denying her motion to suppress statements she made to police after she was confronted with the improperly seized CSLI. Defendant also suggests that the trial court should have suppressed her statements because police obtained her cell phone billing information without a warrant in January 2015 and used that information to learn that she called Billy Graham's hotline on December 7, 2007, then used the information, together with the CSLI information, during the April 2015 interview to obtain her confession.

This Court reviews de novo constitutional issues and the application of the exclusionary rule. *People v Campbell*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 344078); slip op at 2. When reviewing a trial court's ruling on a motion to suppress, we review the trial court's factual findings for clear error and review de novo the trial court's interpretation of the law or application of a constitutional standard. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014). With regard to the unpreserved challenge to the use of evidence obtained from defendant's cell phone billing records, defendant failed to properly preserve this issue by specifically raising

---

[3] Defendant did not attempt to suppress the cell site location information itself, but only her statements made to police when the officers confronted her with the information.

this issue before the trial court, and we therefore review the issue for plain error affecting defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The United States and Michigan Constitutions both guarantee the right of citizens to be free from unreasonable searches and seizures. See US Const, Am IV; Const 1963, art 1, § 11; *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). A search occurs when "the government intrudes on an individual's reasonable, or justifiable, expectation of privacy," and property is seized when "there is some meaningful interference with an individual's possessory interest in that property." *People v Woodard*, 321 Mich App 377, 383; 909 NW2d 299 (2017). The reasonableness of a search and seizure is fact specific and is determined by examining the totality of the circumstances. *People v Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005). To comply with the prohibition against unreasonable searches and seizures, the police must establish probable cause and that they either obtained a warrant to search or that the search fell within an exception to the warrant requirement. *People v Kazmierczak*, 461 Mich 411, 418; 605 NW2d 667 (2000).

Generally, evidence seized in violation of the constitutional prohibition against unreasonable searches and seizures must be excluded from evidence at trial. *People v Mahdi*, 317 Mich App 446, 458; 894 NW2d 732 (2016). The exclusionary rule was judicially created to protect the Fourth Amendment right to be free of unreasonable searches and seizures by barring admission into evidence of "materials seized and observations made during an unconstitutional search." *People Hawkins*, 468 Mich 488, 498-499; 668 NW2d 602 (2003).

However, in *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004), our Supreme Court adopted the good-faith exception to the exclusionary rule, stating that "[t]he purpose of the exclusionary rule is to deter police misconduct. That purpose would not be furthered by excluding evidence that the police recovered in objective, good-faith reliance on a search warrant." Thus, the "application of the exclusionary rule is inappropriate in the absence of governmental misconduct." *People v Frazier*, 478 Mich 231, 250; 733 NW2d 713 (2007). Rather, "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right . . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Michigan v Tucker*, 417 US 433, 447; 94 S Ct 2357; 41 L Ed 2d 182 (1974).

In *Carpenter*, law enforcement officers obtained CSLI pursuant to court orders issued under the Stored Communications Act, which requires law enforcement only to show "reasonable grounds" for believing that the CSLI was "relevant and material to an ongoing investigation" to obtain a court order for the information. *Carpenter*, ___ US at ___; 138 S Ct at 2212; 18 USC § 2703(d). In *Carpenter*, the police had obtained the CSLI related specifically to the defendant's cell phone (not from a "tower dump") by obtaining a court order, but did not obtain a warrant for the information. The Court in *Carpenter* held that the locational information police obtained regarding the defendant's cell phone was obtained as the product of a search, observing that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id*. at ___; 138 S Ct at 2217. The Court therefore determined that a court order supported by "reasonable grounds" was not sufficient to acquire an individual's CSLI, and instead "the Government must generally obtain a warrant supported by probable cause before

acquiring" CSLI specific to a defendant's cell phone. *Id*. at ___; 138 S Ct at 2221. However, the Court also explicitly stated that it was not expressing a view on information gathered from cell phone "tower dumps," being "a download of information on all devices that connected to a particular cell site during a particular interval." *Id*. at __; 138 S Ct at 2220.

On remand from the Supreme Court in *United States v Carpenter*, 926 F 3d 313, 318 (CA 6, 2019), vacated in part on other grounds, 788 Fed Appx 364 (CA 6, 2019), the Sixth Circuit determined that suppression of the CSLI gathered in that case was not required because the agents had in good faith relied on the Stored Communications Act when they obtained the data without a warrant. This holding is in accord with the principle that the purpose of the exclusionary rule, being the deterrence of police misconduct, is not served when the police acted in good faith in accordance with constitutional standards that prevailed at that time. *Goldston*, 470 Mich at 526; see also *Davis v United States*, 564 US 229, 231; 131 S Ct 2419; 180 L Ed 2d 285 (2011) (extending the good-faith exception to the exclusionary rule when police conduct in a search complied with binding precedent later overruled).

In this case, we likewise find that the police acted in good faith when obtaining information regarding defendant's cell phone as part of the "tower dump." Here, when police in 2009 obtained information from a "tower dump" of certain cell phone towers at the times relevant to Kelly's disappearance, they did so with a court order under the Stored Communications Act, which was not considered to be improper conduct under existing precedent. Indeed, even now this conduct has not been determined to be inappropriate, as the Supreme Court in *Carpenter* specifically declined to extend its holding to information obtained by police through a "tower dump." We also decline to do so here. We therefore conclude that the trial court did not err when it denied defendant's motion to suppress her inculpatory statements made after police revealed information to her they had gleaned from the tower dump.

To the extent that defendant contends on appeal that her cell phone billing records led to the police discovering the information that she called Billy Graham's hotline and using that information while interviewing her, we note that defendant failed to properly preserve this issue by specifically raising it before the trial court. We therefore review this issue for plain error affecting defendant's substantial rights, *Carines*, 460 Mich at 763, and conclude that this issue is without merit. In *Carpenter*, the Supreme Court did not determine the constitutionality of obtaining a defendant's cell phone billing records without a warrant, see *Carpenter*, ___ US at __; 138 S Ct at 2234 (KENNEDY, J., dissenting), which differ from locational records. The holding in *Carpenter* was bound in an expectation of privacy in *locational* information. Because defendant points to no binding precedent to support her contention that her Fourth Amendment rights were violated with respect to the billing records, we find no error affecting defendant's substantial rights.

## B. OFFENSE VARIABLE 7

Defendant also contends that the trial court improperly assessed 50 points for Offense Variable (OV) 7, thereby invalidating her sentence. We disagree.

This Court reviews de novo the proper interpretation and application of the sentencing guidelines. *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004). Under the sentencing

guidelines, the trial court's factual determinations must be supported by a preponderance of the evidence, and we review those determinations for clear error. *People v Hardy*, 494 Mich 430, 438-439; 835 NW2d 340 (2013).

OV 7 relates to aggravated physical abuse. MCL 777.37(1) provides:

(1) Offense variable 7 is aggravated physical abuse. Score offense variable 7 by determining which of the following apply and by assigning the number of points attributable to the 1 that has the highest number of points:

(a) A victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ......................................................... 50 points

(b) No victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ......................................................... 0 points

"OV 7 is designed to respond to particularly heinous instances in which the criminal acted to increase [a victim's] fear by a substantial or considerable amount." *People v Rodriguez*, 327 Mich App 573, 578; 935 NW2d 51 (2019) (quotation marks and citations omitted). Under OV 7, a trial court may assign 50 points if the defendant treated the victim with sadism *or* torture *or* excessive brutality *or* "similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1); see *Hardy*, 494 Mich at 441. In determining whether a defendant should be assigned 50 points for OV 7 for such "similarly egregious conduct," trial courts should inquire "(1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *Hardy*, 494 Mich 443-444.

In this case, the record supports the finding that defendant engaged in conduct that was beyond the minimum required to commit the offense of second-degree murder. The offense of second-degree murder is satisfied when an act of the defendant, with malice and without justification, causes the victim's death. *People v Mendoza*, 468 Mich 527, 534; 664 NW2d 685 (2003). Malice is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich. 442, 464; 579 NW2d 868 (1998). In this case, defendant confessed that she had an altercation with the victim at the victim's home that resulted in the victim lying unconscious on the floor. Defendant then placed duct tape over the victim's mouth, duct-taped her hands, placed her in the trunk of the victim's own car, drove the car and parked it on the street near the defendant's home, then left the injured victim trapped in the trunk, in the dark, throughout a cold December night. When defendant reopened the trunk the next morning, the victim was dead. Because defendant took the unnecessary step of causing the injured victim to die, perhaps slowly, in the trunk of her car in the dark and extreme cold, the trial court correctly concluded that defendant's conduct went beyond what was necessary to commit second-degree murder. See *Hardy*, 494 Mich at 445. We also conclude that a preponderance of the evidence supports the trial court's finding that defendant's

conduct was intentional and designed to considerably increase the victim's fear and anxiety. See *id*. at 447. We therefore hold that the trial court properly scored OV 7.

## C. VALIDITY OF SENTENCE

Defendant also contends that although her minimum sentence is within the guidelines range, this Court should review her sentence because *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015) invalidated MCL 769.34(10). We disagree.

This Court is required to review for reasonableness only minimum sentences that depart from the minimum sentencing range recommended by the sentencing guidelines. *People v Anderson*, 322 Mich App 622, 636; 912 NW2d 607 (2018). Under MCL 769.34(10), this Court is required to affirm a minimum sentence that falls within the recommended minimum guidelines range "unless there was an error in scoring or the trial court relied on inaccurate information." *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016). Because defendant's minimum sentence is within the recommended minimum sentencing guidelines range, we are thus required to affirm her sentence.

We reject defendant's challenge to the validity of MCL 769.34(10). In *Lockridge*, our Supreme Court held that the sentencing guidelines were advisory only, and "sever[ed] MCL 769.34(2) to the extent that it [was] mandatory and [struck] down the requirement of a 'substantial and compelling reason' to depart from the guidelines range in MCL 769.34(3)," but did not strike down MCL 769.34(10) as unconstitutional. *Id*. at 391. This Court thereafter concluded that MCL 769.34(10) is constitutional and consistent with *Lockridge*, noting that "*Lockridge* did not alter or diminish MCL 769.34(10). . . ." *Schrauben*, 314 Mich App at 196 n 1. We therefore decline to review defendant's sentence for reasonableness.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Amy Ronayne Krause
/s/ Michael F. Gadola